The United States Court of Appeals for the 5th Circuit is now open according to law. God save the United States in this honorable court. Good morning. Be seated, please. We hope your travel home goes well enough, considering the impending weather and all that stuff. But we welcome you here today. And as Judge Haynes said earlier, it's probably better to travel from Houston to Dallas right now than New Orleans. We have two cases on the docket. I think most of you are quite familiar with our rules. But I will say that we have time limits that we urge you to pay attention to. We have read the briefs and record excerpts. Whether we have delved into the record at any great length is sort of uncertain. The first case has quite a record, for instance. And so we appreciate the record citations. With that, we'll call Morash v. Valley Ridge Roofing, number 21-10212, and Mr. Rukavina. Good morning, Your Honors. May it please the Court. Judge Jones, you're right. The record is extensive, but the operative facts are rather simple. Morash indirectly owned and funded 7901. 7901 borrowed $3.4 million from Frost Bank, which Morash guaranteed. It used those funds to convert an old Home Depot into a world-class shooting range. At the same time, the city lent $180,000 to the tenant. That was intended to be a long-term lease. Well, the tenant absconded, leaving this empty building and leaving Mr. Morash with having to pay on his guarantee every month and having to fund operational costs. For two years, he tried to sell that property, and as the record explains, because of the unique characteristics, he was unable to. In the meantime, Valley Ridge secured its half-million-dollar judgment and obtained a lien, the fourth-priority lien. So you have the taxes in the first priority, Frost Bank in the second priority, and then the city of Brooklyn. Did Judge Mullen misspeak in the stipulated facts where he said something about Morash or 7901 paid off a half-billion dollars on the judgment? I'm not sure I know what the court is referring to. It's in the stipulated facts, if I'm wrong. Yeah. A lot of the judgment originally was paid off. The judgment was for more than $500,000, and perhaps Mr. Bagelman can clarify. It predates my time. Okay, but it's finding 20. I had the same question. It says factual finding 20, after the arbitration was instituted, before the award, 7901 paid $521,000. I believe that there were some suspense funds. I know that there was a payment made. Again, the roof cost, again, Mr. Bagelman might know better, more than $2 million. And the amount in dispute at the end of the day was $300,000, which grew to $500,000 with attorney's fees. Okay. Well, I don't want to waste your time. No, it's okay, Your Honor. Thank you. So Mr. Morris did what he thought was best for everyone. He purchased a third priority lien. He created Silver State to do so, and he then, through Silver State, foreclosed on that lien. Did he do anything? Suppose he had put 7901 in bankruptcy in October of, what was it, 2017 or 18? 18. Suppose he had put it in bankruptcy. Could he not have also done exactly the same thing with the trustee's approval after it went into bankruptcy? Absolutely, Your Honor, and that's part of my arguments why this cannot be an actual fraudulent transfer. What happened under state statute is that there was a publicly held auction, an advertised auction with 21 days' notice. And in bankruptcy, I know that Your Honor is an expert in bankruptcy, auctions are the best way to test the value of a property. So had 7901 filed bankruptcy, had it filed a Chapter 11 or a Chapter 7, and had the automatic stay not been lifted, the property would have gone to an auction. But wouldn't there have been notice to all of the creditors, including Valley Ridge? Yes, it would have. Okay, and it wouldn't have been just notice on some bulletin board. There would have been actual notice. Judge Haynes, you're correct, but I would suggest that Valley Ridge did have constructive notice as a matter of law. No, I understand that, but I'm saying actual notice because a big part of this case is the lies to Valley Ridge. And that would have been harder if there was a bankruptcy and they had notice of the bankruptcy. They can show up and argue and whatever, and the bankruptcy court can deal with it as they did here. But with the – and I understand the concept of constructive notice, but it is quite different from actual notice. It is quite different. And there's not the lying with actual notice and not the lying with the bankruptcy that is a big part of the framework of what the judge was looking at here. Judge Mullen certainly felt that the attorney involved, and it wasn't me, and Judge Mullen didn't name the attorney. I don't understand why he didn't name him, but that's okay. Judge Mullen certainly found that the attorney misled Valley Ridge. However, my client was not sued for fraud. My client was not sued for lying, and the lying occurred after the foreclosure. With due respect, Judge Haynes, the foreclosure – No, no, it occurred before it. It occurred throughout the whole period. What's happening? Oh, nothing, la, la, la. The day that they're setting up the foreclosure, they're telling Valley Ridge, oh, yeah, we're still working along, la, la, la, la, la. And so the lying was throughout. It wasn't just after the foreclosure. It was before. And that may be – certainly I'm not going to quarrel with Your Honor. Does Morash have a duty under state law to inform junior creditors of an impending sale? Absolutely not, Your Honor, and that's a 19th century – And is that law different in bankruptcy than it is outside of bankruptcy? Yes, because as Judge Haynes pointed out, had there been a bankruptcy, all creditors would have been entitled to – Did anybody argue or did Mullen find here that Morash had a duty to put 7901 in bankruptcy in order to do this sale? No one argued that, and he did not find that, and that's part of my argument, Your Honor, that the bankruptcy court converted him into a guarantor of success after he tried to sell the property for two years. But, Judge Haynes, back to your point, because certainly I perceive Judge Mullen to have felt that what happened here was inequitable, and I perceive that he tried to find a solution to that. But we must remember also that Valley Ridge could have foreclosed on its lien for two years. It didn't because it didn't want to service the senior debt. And we must remember that if you're a junior, if you're in fourth position at the lien, you ought to be checking the – you know that there's feelings ahead of you that are in default. You ought to be checking the notices. Okay. So I'm not going to make you agree that there was a lie, but the court certainly found that. We defer to fact-finding. So let's assume, arguendo, there were lies throughout from your side of the table, not you personally. What is the – what benefit can you – I mean, how can you prevail on that? How can Valley Ridge deal with the fact that they were lied to and it caused them to change what they did? Let's address then the fraudulent transfer, the preference, and the fiduciary duty. The fraudulent transfer requires that there be a transfer by the debtor. I've made that argument. The court knows that argument. It requires that under Tufte that there be an asset. An asset is defined as net of all liens. Even if we accept Judge Mullen's valuation of $4.2 million, once you include all the liens, it's not an asset. And Tufte requires the mens rea to hinder, delay, or defraud a creditor with the transfer. So, yes, Judge Mullen found that there was some lying, but my proposition is a simple one. When the underlying debt is not fraudulent and when the actual foreclosure is not fraudulent or collusive, the mens rea doesn't matter. A wily, shifty, competitive creditor used a legal mechanism, if that's what the court thinks happened here, to benefit himself at the expense of junior creditors. There is no case, is there, and maybe Mr. Begelman can respond to this, that has ever held that a regularly conducted, non-collusive foreclosure sale, where notice is given to the world appropriately in accord with state law, is a fraudulent transfer. No, Your Honor. And there's no question that this was regularly conducted, non-collusive, with an independent third-party trustee. Who had conducted 16,000 prior foreclosures over his 28 years, who was not related to the parties. And, again, anyone could have shown up. If there was hidden value in this property, anyone could have shown up. And at least in Dallas and Tarrant County, every first Tuesday of the month, I drive by them and I see people out there. The foreclosure markets work. I'm not going to sit here and pretend that they derive the highest value. They don't. But there are people who actively participate in these looking for hidden values. So you're saying the BFP court, because it recognizes in that footnote that a fraudulent transfer can include a foreclosure, but you're saying that's limited to collusive? That's what I'm saying, Your Honor. That's what I'm saying. And if we look at BFP, it's concerned about a judicially created cloud on title. Anytime you have a foreclosure by way of credit bid, people are going to be concerned. This same judge already has another case like this where a debtor filed bankruptcy to redo the past and try to take back property that was foreclosed upon through a deed in lieu. My firm is trying that right now. So what about preference? Because I read your argument, correct me if I'm wrong, that your argument that a valid, lawful, and non-collusive foreclosure has some protection, I mean, that's based on a fraudulent transfer theory, right? Correct. So on the preference, you're not arguing that the foreclosure has some sort of general immunity from preference. Is it mainly the challenge to the valuation? Judge Costa. And then the El Paso issue? Yes. My argument is that the lying, as Judge Haynes calls it, is irrelevant to the elements of a fraudulent transfer preference and breach of fiduciary duty. In a preference, you have El Paso, you have Tulsa, and you have this court twice before saying that when a secured creditor recovers its collateral, it is not a preference because 547B5 is not meant. Well, you also have the Ninth Circuit in the Erring case, don't you? You do, Your Honor. Absolutely right. And in those cases, at least in El Paso, certainly the creditor would have recovered 100 percent of the collateral in the bankruptcy, which is the hypothetical inquiry, what would have happened in the Chapter 7. And if we look at that, Judge— What would have happened in this Chapter 7? Judge Costa, that was their burden of proof, and the only evidence was my expert, my expert who's been a trustee for almost a year. Somebody should have rehabilitated your expert. Your Honor, I didn't feel that—I felt that he testified correctly. He said that in a Chapter 7, the same thing would have happened. So you agree that that preference issue does turn on that fact-finding of what would have happened in the Chapter 7? I don't agree with that, Your Honor. Why not? I don't agree with that because I think there's a body of federal case law that says that preferences are not intended to avoid or to limit secure creditors from exercising their rights. That's El Paso. Preferences exist to benefit unsecured creditors when other unsecured creditors are preferred, literally preferred. I agree with you that this judge, Judge Mullen, looked at the— So they would have been preferred here if they wouldn't—so, yeah, in El Paso, if they're going to get 100 percent collateral anyway in the bankruptcy, how are they being preferred? It's no—that's why it seems to turn on what they would have gotten. As El Paso said, there's this hypothetical inquiry. But, Judge Costa, think about it. If you're a foreclosing creditor, almost never do you get made whole. Sometimes you do get made whole. You take the risk. You're taking the risk of foreclosure. You're servicing the senior debt. If there is certain value there, if you improve, that's part of your benefit of the bargain. Because I would venture to say that 90 percent of the time when you take back your collateral, you have a large deficiency. I would also venture to say, Judge Costa, that, again, preferences just—the world of preferences and secure creditor rights conflict. And we go back to BFP here. But I would also add, going back to my expert, he testified that the same thing would have happened in a hypothetical Chapter 7. Judge Mullen found him credible. The same thing doesn't mean— Well, I mean, to be a little more precise, I'm sorry, you know, I think it's regrettable. But what Judge Mullen said was Frost Bank would have foreclosed and your client would have been out as a junior creditor, junior lien holder. Your Honor, that's not what the evidence showed. The evidence showed— Well, that's what Judge Mullen technically found, right? I don't know if that's what he technically found. I thought so. The expert testified, and Judge Mullen, I think, found that it would have gone to a foreclosure in a hypothetical Chapter 7 because the trustee would have— And that's—I mean, that's incontestable. That's incontestable. But what would have happened at that foreclosure, whether my client would have bought out Frost Bank or whether Frost Bank would have foreclosed, we don't know. But it's also immaterial because no value possibly would have flown to unsecured creditors. Would this Court be creating a circuit—creating a circuit conflict if we held in this circumstance that the transfer was a preference? You would be with the Ninth Circuit. We would be creating it, not just wading into it because there's no circuit-level case on the other side. The only case is erring from the Ninth Circuit, and it holds exactly as Your Honor said. Judges, Your Honors, I do want to briefly discuss the breach of fiduciary duty because I don't want that to be the tail wagging the dog. Again, Mr. Morash owed no duty to creditors. If there was lying, that's not a breach of fiduciary duty. That's perhaps another cause of action that was not pled and asserted. Mr. Morash owed no duty to keep funding 7901 ad infinitum. Mr. Morash owed two duties, the duty of care and the duty of loyalty. The duty of loyalty does not apply when the entity doesn't have a corporate opportunity. But think about what Judge Mullen did here. Judge Mullen basically created a rule that an insider can never lend funds to its entity and exercise his rights because he is acting adversely to the interests of his entity. And we all know that in the real world, especially with newly created entities, insiders fund them. And insiders have every right, as long as there's not extrinsic fraud, insiders have every right to the same protections as any other secured credit. Well, was this a corporate opportunity so much as it stopped the bleeding opportunity? Your Honor, it is. I mean, because the idea of corporate opportunity presumes that there was some kind of value that the corporation would have, and it had zero in the bank, so it couldn't have. That's exactly right, Your Honor. Not just that, but if 7901 was harmed, how was it harmed? It had no equity in this property. Okay, perhaps creditors were harmed. Let's assume that. But there's no duty to creditors. 7901 had $1 in the bank. It had five lien overs on its property. It had no tenant. And for two years, the uncontested testimony was that no one would buy this property at a price. Let me ask you this. We haven't really discussed the fact that Marash is everywhere in this. Does that not make any difference? I mean, he owed the guarantee personally. So we haven't really talked about that. But in the real world, he would have had to pay. The bank. And he was paying. But he would have had to pay in full if they went after him and they weren't able to sell it. So that's what he was trying to address is his own personal self. There's no question. So he's 7901. He's Silver State. And he's the guy that would otherwise owe the money. So he's everywhere. So, I mean, the notion that this somehow affects all foreclosures in the whole world, I don't know that every single foreclosure involves me foreclosing on myself with help from myself. Your Honor, this case, for purposes of fraudulent transfer and preference, cannot be limited to its facts. It cannot. Again, because all of what you just said, yes, Mr. Marash was acting to get out of his guarantee. He was done with disinvestment. He was done with value ridge. And he did the only thing that he thought he could. Yes, he was motivated by selfish interests. None of that is wrong. None of that goes to fraudulent transfer, certainly not to preference. And on the duty of care, I have 15 seconds left. On the duty of care, again, where is the gross negligence? 7901 could have done nothing to get itself out of its situation without Morash pumping in more money, which we know he was under no duty to do. Thank you, Your Honors. Very, very succinct.  Mr. Bagelman. Thank you, Your Honors. First, to address the question that was asked at the beginning is, originally, value ridge filed a mechanics lien that was in the amount of about $823,000. And it was unsuccessful in getting any additional amounts paid from 7901. So it initiated an arbitration. And between the time that it initiated the arbitration and the judgment was rendered in the amount of $508,000, 7901 did pay a certain amount of the monies owed to value ridge, leaving a balance of about $300,000. And that was the issue that was litigated in the underlying arbitration that resulted in the $508,000 judgment. The facts of this case are simple. But this is not a case where a typical secured creditor foreclosed on its lien against real property. Ultimately here, the result was a property worth millions of dollars went from one related entity to another related entity, except for being burdened by both the mechanics lien and judgment lien that Valley Ridge had. As stated in Valley Ridge's brief, if this is not a fraudulent transfer, I don't know what is. Well, except there's not a single case in the history of the U.S., unless you can tell me one that's ever held, that a regularly conducted non-collusive trustee sale conducted by an entirely independent trustee with notice to the world, and your lawyer should have, his lawyer, Valley Ridge's lawyer, was on notice that the property records, that the property was underwater and could be, Frost Bank could have foreclosed at any minute during this entire period. And yet your lawyer sat by and ain't sure he was led down the garden path. But there's no case to support your theory. There's two cases, Your Honor, within the, not Fifth Circuit cases, but within the Fifth Circuit. PDVSA Petrolia versus Trigent, which is cited in both parties' briefs at 212 Westlaw 3249531. The bankruptcy court in the Southern District of Texas found that foreclosure on a refinery was an actual fraudulent transfer under both the bankruptcy code and Tufta. And there's no indication in any of the detailed findings of fact in that case that the foreclosure sale itself, the manner in which the foreclosure sale, not the entirety of the transactions that led to the foreclosure sale, was collusive. Second, in N. Ray Cowan, 492 Bankruptcy 858, and also in the Southern District of Texas from 2013, which was affirmed by this court on other grounds, the court found that the foreclosure on tax liens on the debtor's property was an actual fraudulent transfer under Tufta. And in that case, there was a sham agreement for the second party to pay the debtor acquired property subject to a first lien at foreclosure sales. Well, I'll take your word for it because there's a lot to get to in this case, and I appreciate that information. Well, Tufta, the state law has some contemplation of foreclosure sales being transferred. You're correct, Judge Costa, and that goes to the issue of whether or not 7901 actually transferred the property because the Bankruptcy Code makes it very clear that a transfer includes a foreclosure of equity of redemption, which is exactly what happened here. But there's no such thing in Texas. In Texas, the definition of transfer within Tufta doesn't include that language. It doesn't exclude it except for the fact that, at least as the briefs seem to say, that, I mean, nobody ever considers that. Well, and in Tufta, under a different provision relating to constructive fraudulent transfer, it does talk about basically the holding in BFP that the price paid at a regularly conducted foreclosure sale is reasonably equivalent value. And so as Judge Mullen said and as we argued in the lower court and in our briefs, that language in Tufta, it certainly indicates the Texas legislature's intent to include foreclosures as a part of a transfer, even though that language is not specifically in the definition. I'm not really challenging that, but go on. So would we be creating a circuit split if we affirmed? On what issue? On preference. On preference, no. And I will address that. You know, there are new cases that were put in the appellant's reply, including the Aram case, but the difference for all of those cases that were cited by the appellants in this case is that in those cases, the first lien holder was the party that was foreclosing. And when the first lien holder in those cases, the court either presumed that the first lien holder would receive all of what it would receive the same in a hypothetical chapter seven that it received in the foreclosure, and so therefore determined there was no preference. In this case, the evidence and the testimony of Mr. Seidel is in the record. It's 1701. I read his testimony. And he unequivocally said that if there had been a hypothetical chapter seven either in the bankruptcy, Frost Bank, the first lien holder, would have foreclosed. Second lien. Second to the Tarrant County taxes would have foreclosed, and Silver State would have been wiped out. But as a matter of law, it is also correct. It's not just correct. It's indisputable that Morash could have paid off the city of Richland Hills lien and then immediately foreclosed himself or bid at that liquidation, right? And I'll bet you Frost Bank would have preferred that because, you know, better to have somebody who's paying the debt. Well, yeah, he could have done that, but if he would have done that, then he wouldn't have accomplished what was his absolute clear objective from his e-mail to the city, that he wanted to wipe out other junior liens. But it is true that Judge Mullen made many, many fact findings adversely to Morash, but none of them said that Morash had a duty to put 7901 in bankruptcy earlier than it went in involuntarily. That's correct. He did not ever make a finding that they had a duty. But as a result of his conduct, instead of doing that, which would not have resulted in a claim for fraudulent transfer. Let me ask you about something that troubles me greatly about what happened here. Your client put 7901 into an involuntary. A trustee was appointed. Who was the trustee, by the way? You know. A holder. Well, that's okay. I just want. So is it correct that 7901 had $5 million worth of unsecured debt at the time? At the time that it was put into bankruptcy, it had about $3.4 million in debt owed to Frost Bank. I understand that. I'm talking solely unsecured because I'm pretty sure that I read somewhere in the briefing that there was several million dollars of unsecured debt. No, I believe that's correct, Your Honor. Okay. So your client is owed around a half million dollars. So you're owed maybe generously 25% of all the unsecured creditors. And your client, quote, settles or buys off the trustee for $50,000. And this judgment of Judge Mullen gives your client the entire alleged residual value in this property, $500,000 or $600,000. And those other creditors are going to get zero. Now, how can that be the case if the avoidance of a preference is supposed to benefit unsecureds?  Well, Valley Ridge was a secured creditor. No, they were a secured creditor that was underwater, but anyway. But the only other unsecured creditors was a landscaping company. I don't care who they were. Well, number one, they did not timely make proofs of claim in the underlying bankruptcy. They were all on notice of the ‑‑ and so, therefore, their claims were either not valid or were taken care of by other means as a part of the Silver State plan. Not Silver State. Wait. Silver State paid off all the 7901 creditors? Is that what you're saying? They did not pay them off, but they were either they were not valid claims or they were taken care of and included in the Silver State. What the heck is the fraud here? Well, the fraud is what Mr. Marash in 7901 did to avoid secured creditors that were junior to the second lien owed to the city, which was a judgment owed to Valley Ridge that Mr. Marash never thought he should have gotten by doing this fraudulent transfer. Silver State, you know, we talk about Silver State, you know, stopping the bleeding 7901. As we pointed out, Silver State was nothing but a sham entity. Well, that's right. So if you look at it that way, Mr. Marash paid over $200,000 from whenever he started paying on the Frost Bank and security and electricity for the property. He paid over $200,000. He purchased the city of Richland Hills lien for another $180,000. So he invested about $300,000 before he foreclosed on the property, correct? At which time there is no contrary finding in the record. There was no possibility of a sale at that point. Well, I think there had been a contract for the sale of the property. Excuse me, but you know very well Judge Mullen found all those contracts had fallen through the cracks, and this other purchaser came by the grace of God or whatever about three or four weeks after the foreclosure occurred, and no doubt. It was probably somebody who was looking at the property and said, ha-ha, now that two of the liens are gone, I can deal with this. And the argument that Mr. Marash makes is that somehow he had a financial burden that he needed to relieve himself. But the point I was going to make is Silver State never even existed until he negotiated the assignment of the lien. Silver State never had a bank account.  And Mr. Marash, through his other entities, just like he was doing before that. What's your cause of action that relates to any of that? Judge Mullen did not find that the creation of Silver State was itself fraudulent. Nobody. I mean, that you're. . . It's the badges of fraud that are under both the, that you look at under 548 of the Bankruptcy Code and under Section 24.005. And you look at the badges of fraud, and Judge Mullen found seven badges of fraud out of the 13 that this court would look at under the 11. And under those badges of fraud, along with all the evidence, it showed the clear actual intent on the behalf of 7901 to delay, hinder, defraud Valley Ridge. That was the purpose of this transaction, to say that somehow he needed to stop the bleeding. He could have stopped the bleeding by filing a foreclosure. This series of transactions. . . Well, I mean, let's not remember what the bleeding is. It's that he stabbed himself by guaranteeing the second lien or whatever, the mortgage on the property. And so that's the problem, is that he personally had guaranteed it. So it's not like he's investing in this out of graciousness to the world. It's because of his own guarantee. He doesn't want to end up owing a couple million to this bank personally, right? Because he personally probably had the money. It's the company that did it. I agree, Your Honor, and that's part of the evidence that goes to the breach of fiduciary duty, that he had a personal interest in protecting himself from the foreclosure. What fiduciary duty to whom? You don't have a fiduciary duty to other creditors. He had no fiduciary duty whatever to Valley Ridge. He had no fiduciary duty. I mean, Mr. Riccovino went through the possibilities. There's no duty of loyalty here because there's no corporate opportunity for a bankrupt, for an insolvent company that can't take advantage of the opportunity. Well, the fiduciary duty he owed was $79.01. That's what I'm saying. And Valley Ridge stood in . . . What's your best case for saying that he had a . . . what was the nature of that fiduciary duty? That Judge Mullen found that there was equity in this property. But you can have a property that has equity, but it's worthless if you can't pay the going freight. If Valley . . . I don't understand that conclusion. Well, the property had equity if it would have been sold. Mr. Marash wanted to create more equity, but . . . He was trying to sell it. That's in the record. But the idea that he was trying to sell it and he couldn't, and by orchestrating this scheme to create more equity, that somehow it was going to enable . . . it was going to open up more money for him to be able to fund this property is false. He ended up buying the property himself through Silver State. He didn't do this foreclosure and end up getting out from underneath the Frost Bank loan and giving the property to some regular third party. He ended up buying the property . . . What could 7901 have done that was the opportunity that he's 7901 with $800 in the bank account? And if he had walked away, what would 7901 have been able to capitalize on from this property? If he would have walked away, Your Honor, I have no doubt that Frost Bank would have foreclosed. Correct. So there's no corporate opportunity. The opportunity was to continue doing what he was doing for months, which was fund the property through other entities. But Judge Mullen said he had no duty to continue. He had no duty, but he was doing that. And the fact of the matter is he continued to do that after the foreclosure sale because Silver State had no money. And Mr. Marash, through DF Land or Marash Family Partnership, continued to put the exact same money. So he didn't accomplish anything by taking the assignment of the lien and foreclosing other than creating even more equity in the property because, as he testified, he knew no one else was going to show up. What difference did all the lying from the lawyers make? Lying from the lawyers. What difference did that make to your client? I think, as Judge Mullen pointed out, there was, with respect to one, not, you know, we did this post-judgment discovery trying to figure out what liens was on the property, and they failed to. Right, but what would you have done differently if you'd known about the foreclosure coming up? Had we known about the foreclosure, we would have gone and sought an injunction to prevent the foreclosure. On what basis? On the basis that it was going to be a fraudulent transfer. We may have moved sooner than we did before to put 7901 in an involuntary bankruptcy to avoid this. And this goes back to the, Your Honor, I don't know if I addressed it completely, is the trustee was appointed after the involuntary petition was granted. And it was the trustees' lawyers that came, quite frankly, to Valley Ridge and said, we do not want to continue to pursue this case. Why? Why didn't they want to? I think that they didn't. They didn't think there was any money to be had. Well, that may be, but we decided that based upon a negotiation that was within the, which every party knew about and was approved by the bankruptcy court, we decided that we believed in the claims that had been asserted in the state court. Were you offered a settlement by Morash 7901 or Silver State? Prior to the trial on the adversary proceeding and prior to, and possibly, I don't know whether it was before or after the involuntary petition, there were some discussions between myself and the unnamed lawyer that I was dealing with, that I will just not name here today. They make a big deal about that. We address it in our briefs. But there was discussions that none of them were in writing, none of them were formal offers, and they were things that would have offered, in my opinion, in my client's opinion, a very minimal amount relative to the amount of the judgment that it had. Has a grievance been filed on the unnamed lawyer? Not to my knowledge. Why not? I don't know. And the court has the record and the testimony. The lawyer testified at trial. So I can't answer why or if a grievance has been filed against that lawyer. But let me just tie down this one point that I'm unclear about. So preferences 547, 548 transfers ordinarily go to the benefit of all the creditors. And you're representing to us that all of the creditors of 7901 were satisfied either legally or practically by your $50,000 payment and, you know, their claims weren't any good or what. So your client did not get more than those unsecureds, had they filed a proper claim, would have gotten? Had they filed a proper claim, what they would have gotten, whether they would be entitled to the proceeds, whether they would have joined in the claim, I can't speak to. But I do, to answer your question in the affirmative, I do believe those people either didn't have a valid claim or were otherwise taken care of. And otherwise, I don't believe Judge Mullen would have approved the interstate settlement that he did. Do we have the record of that interstate settlement before us? I don't believe. I actually looked, Your Honor, yesterday, and I don't believe that the order approving the interstate agreement is in the record on appeal, but it is a document within the bankruptcy court record. Do you have any? We asked a lot of questions. Is there anything else you want to say? Only, Your Honor, that if this court adopts the invitation to be the first court to rule that a regularly conducted non-collusive foreclosure can never be a fraudulent transfer as a matter of law, one, I think it's contrary to the language in BFP, and second, I think all it would do would to invite debtors to either when there was impending judgment or when there was an actual judgment to allow related parties to have a lien on their assets and then foreclose in accordance with Texas law and have that transaction that would clearly be contrary to the fraudulent transfer laws, be immune from any liability. And last, as Judge Scalia said in the BFP, he said until the Durant decision out of this court, there had been 400 years of harmony between the fraudulent transfer laws and the foreclosure laws. Right. And I would suggest that if this court were to adopt the ruling that you've been invited to adopt and be the first court to do so, that would completely eliminate that harmony, you know, much less disrupt it in any way. Well, isn't it also the fact that you can only point to two bankruptcy cases in the history of 400 years of fraudulent conveyances suggests that very few people have had any reason to make this argument before, so you're on the brink of novelty yourself. Well, I found two cases. I probably could find more in other circuits. Well, why don't you see if you can do that? Okay. You're more than welcome to. Thank you, sir. Thank you. Mr. Rucavina. Your Honor, thank you. Please allow me to leave you with this thought, especially you, Judge Haynes. No one in this case shines. Mr. Morris doesn't shine. My client doesn't shine. The situation was not fun for anyone. But don't think that Valley Ridge shines for a moment. Again, they could have exercised their rights to foreclose. This isn't a matter of shining. I honestly think lawyers are subject to ethics rule that the ordinary person is not, and they can't go around affirmatively lying, even if that benefits their client. So I'm just wondering about whether a grievance should have been filed against this lawyer. What do you think? Your Honor, please don't put me in that position. I'm not saying you did it. I'm asking you whether you think that should have been done. Your Honor, I don't want to, and I can't answer that question. We can't comment on that. I know this lawyer, Your Honor, and I believe that this lawyer did everything in his mind and good faith, and I was surprised at the findings of lying, but those are findings. So you disagree that he lied? I do disagree, Your Honor. Okay. And I apologize, but the findings are what they are. But allow me also to address Judge Jones's question, because this isn't a record. Judge Jones, Morris and 7901 tried for years on multiple occasions to resolve this, and Valley Ridge wouldn't take a penny off its debt. That's its right, but with that come consequences. And even in this litigation, I'm not going to violate Rule 408. We, like Mr. Begelman told you, there were talks, but Valley Ridge never would take a dollar off. And you're wondering. Did you undertake the opportunity of the circuit mediation program once you got the case on appeal? Your Honor, we talked to the lady's name. I forget her name right now, and I told her basically, and I think Mr. Begelman agreed with me that we tried and exhausted for years any kind of discussion, so we didn't want to waste her time. But I do want to say we're not fighting over much money, $500,000. That's a lot of money to me, but that's a lot less. Sometimes people do go to the mediation program after oral arguments. But I think Your Honor sees Judge Costa that we're arguing over matters of serious principle, legal principle that is, and certainly Valley Ridge and Mr. Morris feel strongly about their own personal views here. And Mr. Morris feels very strongly about having a federal court find that he breached his fiduciary duties. And certainly Valley Ridge feels very strongly about a federal court finding that it was lied to. But again, Judge Haynes, I think that the rules of equity here say when neither party shines, when every party here has done something that's not exactly the best, equity leaves them as they are. Let them fight over their legal rights. My client exercised a legal right to purchase legal debt to foreclose, and it's the law that extinguished their lien. Is there any case that says that an insider creditor cannot purchase a foreclosure? No, Your Honor, absolutely not. And it happens a lot, doesn't it? Exactly. And as Mr. Morash and the trustee testified, anyone could have come in there and purchased. Mr. Morash wanted someone to come in there and purchase because they would have to purchase for cash money to pay off Ross Bank. So rather than him then having to continue servicing Ross Bank for six months because he credit bid, a third party would have had to pay off everyone. He's done, gone. There was no concealment, no collusion. Anyone, Valley Ridge, I don't want to be flippant, but Peter Pan could have come and bid at that auction if there was hidden value to be had. That can't be fraudulent. It can't. Subjective intents don't matter. Your Honor, I disagree with Mr. Bagelman. This is a BFP situation. This is 400 years of harmony being unharmonized. Actually, you don't need to go. So I know your brief argues that this kind of transfer can never be a fraudulent transfer. But certainly on the facts of this case, one can draw that conclusion, arguably, without making a broader conclusion. That's where I disagree with you, Your Honor, respectfully. Oh, yeah? This case cannot be limited to its facts. Because think of what if the city had done, and my time is up, but what if I might just continue. What if the city's lawyer had lied to Mr. Bagelman? What if the city's lawyer had misled everyone? It wouldn't change the fact that the city still had a lawful right to foreclose. So, Your Honor, no, whatever lying occurred, whatever inequitable actions occurred, they didn't occur with respect to the exercise of the legal right to foreclose on lawful debt itself. Thank you. All right. Thank you.